IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHARLES REED, III,

                                    **Case No. 2:18-cv-167**

   **Petitioner,**                    **Judge James L. Graham**

                                      **Magistrate Judge Kimberly A. Jolson**

   **v.**

**WARDEN, CORRECTIONAL**
**RECEPTION CENTER,**

   **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties. For the reasons that follow, the Undersigned **RECOMMENDS** that the Petition be **DENIED** and that this action be **DISMISSED**.

## I.     FACTS AND PROCEDURAL HISTORY

Petitioner challenges his convictions after a jury trial in the Franklin County Court of Common Pleas on five counts of felonious assault and kidnapping. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 2} On July 2, 2014, Reed was indicted (in addition to three other co-defendants) for one count of aggravated robbery, six counts of felonious assault, six counts of rape, and two counts of kidnapping. He pled not guilty on July 7, 2014 and ultimately exercised his right to a jury trial.

> {¶ 3} The State tried Reed and his three co-defendants in a single proceeding that began on August 3, 2015. At the outset of the trial, the defense stipulated that DNA was properly collected and firearms found at the scene were operable. In addition, one of the two alleged victims in the case, B.P., had not responded to the subpoena, and the State, therefore, sought and received a warrant for his arrest. Following opening statements, the State began to call witnesses.

{¶ 4} The State first called a Columbus police officer. The officer testified that on June 25, 2014, at 2:24 a.m., he was dispatched to Mount Carmel West Hospital where he spoke to a female victim, A.B. He testified that A.B. appeared shaken but the officer admitted he did not know of what she was afraid. Neither A.B. nor the other alleged victim, B.P., had (to his knowledge) called the police and A.B. did not name anyone who might have hurt her.

{¶ 5} The second witness was also a Columbus police officer. He testified that he picked up A.B. from the hospital for the purpose of identifying a residence on North Harris Avenue where some events relevant to the case were alleged to have transpired. The officer testified that the residence in question was 125 North Harris Avenue.

{¶ 6} The State next called a detective from the crime scene search unit of the Columbus Division of Police. This witness identified photographs taken at 125 North Harris Avenue as well as items of physical evidence recovered. Among the photographs were depictions of a broom with a pole-style handle, a broom handle without a broom end attached, a blue bucket containing a leather belt and a BB gun, a dog cage in a basement, a black and silver handgun, three boxes of ammunition, a number of cell phones, a rifle, and a rifle clip.

{¶ 7} The State then called A.B. as a witness. A.B. testified that she had been, for a period of approximately six years, addicted to heroin but, as of the date of her testimony on August 4, 2015, she had been clean for approximately one year. She explained that she had been acquainted with Reed's co-defendant, Ivan Minor, for around five years and that she and her boyfriend, B.P., went weekly to Minor's house on North Harris Avenue to buy heroin.

{¶ 8} A.B. related that on June 24, 2014, she and B.P. went to Minor's house on Harris Avenue. A.B.'s testimony varied on the exact sequence of events, whether she and B.P. had been there earlier in the day, whether B.P. was intending to apply a tattoo at the residence or trade tattooing equipment for heroin, and whether someone called to her from within the house or whether someone called to B.P. However, on at least some occasions while testifying she said that she thought Reed had called B.P. and her into the house. A.B. testified that once she was inside the house, someone, she was not sure who, displayed a weapon and told her to go in the kitchen, empty her pockets, and strip. Apparently, heroin had gone missing and the people in the house on North Harris Avenue thought she and B.P. had taken it.

{¶ 9} Once she and B.P. had complied in disrobing, someone, she was not sure who, performed cavity searches on her and B.P. in the kitchen. Some time later, she and B.P. were taken into the basement of the house where Minor and other unidentified persons also performed anal and vaginal cavity searches on her using gloves from A.B.'s purse which she had for tattooing purposes. In the basement, a

2

number of unidentified persons, not believing A.B. and B .P.'s protestations that they had not stolen heroin, began to beat B.P.

{¶ 10} The beating began with a bottle but they also used a BB gun, a leather strap, a knife, as well as feet and hands. A.B. was able to identify the BB gun, bucket, and strap offered into evidence among the State's trial exhibits. Specifically, A.B. testified that some people (whom she simply referred to as "they") broke a bottle on B.P.'s head, stomped him with their feet, hit him with their hands, wetted the leather strap and whipped his back with it, smashed his toes with the butt of the BB gun, and shot him in the bottom and the genitals with the BB gun. (Tr. Vol. 2 at 128–30.) They also forced B.P. into a dog cage and sodomized him anally with a broom handle without a broom attached to it. At times when B.P. passed out, they dumped cold water on him to revive him for further beatings. Also, while B.P. was in the cage, they were heating up a knife tip and branding him with it. In addition, A.B. testified that, someone (she did not know who) kicked her in the head a couple of times when the beating first started.

{¶ 11} At no time did A.B. identify who did what during the beatings except to say that Minor and one of his co-defendants, Davonte Clark, stomped B.P. and hit him with their hands. A.B. estimated that she was kept in the basement for at least six hours before she was allowed to leave. She did not attempt to leave or check if the door was locked. However, according to her testimony, Reed and his three co-defendants came downstairs at points to make sure she and B.P. were down there. She also said someone recorded a video of her, naked on top of B.P.'s cage, urinating on him.

{¶ 12} Toward the end of the night, someone gave A.B. some heroin and B.P. some meth to help with their pain and withdrawal sickness. Eventually, the captors let A.B. and B.P. go free reasoning that it had begun to rain outside and any heroin that A.B. and B.P. might have stolen and stashed outside would be ruined. At least Minor, and maybe other persons, warned A.B. and B.P. not to call the police. When she retrieved her belongings and got dressed, A.B. was missing three cell phones and $30. However, neither she nor B.P. called the police. Instead they walked to a friend's house who, when it was apparent that B.P.'s health was poor, took them to Mount Carmel West Hospital.

{¶ 13} A.B. was able to identify all four defendants at trial. However, she admitted on cross-examination that she was in heroin withdrawal during the ordeal and that heroin has a mind altering effect that can make things seem real that are not. Moreover she explained that Reed had not assaulted or touched her and, other than calling them into the house and checking on them in the basement, had no involvement in the activities that night.

{¶ 14} The next grouping of witnesses was composed of staff from Mount Carmel West Hospital; three sexual assault nurses who collected forensic observations and took photographs of the injuries sustained by A.B. and B.P. and a treating

resident physician who treated B.P. According to the physician's testimony, B.P. presented with numerous lacerations, a broken rib, a collapsed left lung, a ruptured spleen rating 4 of 5 on the severity scale, a broken toe, a fractured tailbone, a bruised scrotum, and abrasions around his anus. He was admitted to the intensive care unit and remained there for 5 days. The forensic nurse manager for Mount Carmel Health System also testified, describing the photographed injuries to B.P. and authenticating the exhibits showing injuries.

{¶ 15} Another nurse testified that she performed an exam of A.B. and testified to bruising and other minor injuries to A.B. visible in photographs. This nurse testified that A.B. told her that fingers had been used to penetrate her vaginal area and "butt." (Tr. Vol. 2 at 458.) The nurses also testified that they swabbed areas where foreign DNA might have been present based on the history recounted by A.B. and B.P. and preserved the rape kit for the police.

{¶ 16} The State next called a DNA expert forensic scientist with the Ohio Bureau of Criminal Investigation. According to the expert, DNA tests were run on the rape kits collected from A.B. and B.P., as well as numerous articles found at the scene like the broom handle, BB gun, and pistol. No foreign DNA sufficient for comparison with conventional DNA testing was found in the rape kits or on any of the articles except the BB gun. Id. And Minor, Clark, and Reed could be excluded as contributors to the DNA mixture obtained from the BB gun. The expert testified that Y–STR DNA testing yields a less exact result. The testing produced two DNA profiles on one end of one broom handle, a major and a minor profile. The major profile was consistent with B.P. but Minor, Clark, and Reed were all excluded as contributors to the minor profile.

{¶ 17} Thereafter, a canine handling officer for the Columbus Division of Police testified that on June 25, 2014, he was called to 125 North Harris Avenue at 6:24 a.m. with the SWAT team to help effect an arrest because despite the police having announced their presence, people were not coming out of the house. He testified that after about 15 or 20 minutes, Reed jumped from the second floor window and began limping toward him and a SWAT officer.) Because Reed did not immediately get on the ground when ordered to do so, the SWAT officer hit him with the barrel of his rifle and they arrested him. Other than Reed, everyone else who was in the house came out in an orderly and respectful fashion with their hands raised.

{¶ 18} The final witness called by the State was an expert in cell phone analysis with the Columbus Division of Police. He testified that a detective on the case presented him with an Apple iPhone 4 and asked him to obtain the phone's contents. He was able to use software to bypass the phone's security code and download the contents. Both the Apple ID and the Kik2 ID information on the phone were associated with the name "Charles Reed." (Tr. Vol. 3 at 575–77.) The expert explained, that from his review of the phone's contents, he was able to determine that on June 24, 2014, at 5:18 p.m., a text was sent from the iPhone to a

recipient named "Destiny" which said, "I am on Harris." (Tr. Vol. 3 at 578.) Then at 1:05 a.m. on June 25, the iPhone received a message that said, "[d]id that situation resolve itself at Harris?" (Tr. Vol. 3 at 579–80.) In addition, the iPhone contained a video showing A.B. naked in front of a dog cage appearing to urinate on B.P. The expert explained that while he could not say that this particular phone took the video, he could tell that the video was taken by the same model of phone running the same edition of the operating system, that the video was taken on June 24, 2014, at 4:46 p.m., and that it was taken at the house on North Harris Avenue.

{¶ 19} Following the last of its witnesses and the admission of exhibits, the trial court heard motions by the defendants for acquittal under Crim.R. 29. The State admitted that the evidence was insufficient on three counts of the indictment as to all defendants and the trial court dismissed those counts.

{¶ 20} After closing arguments, jury instructions, and deliberations, on August 11, 2015, the jury returned verdicts. The jury found Minor, Reed, and Clark to each be guilty of five counts of felonious assault and two counts of kidnapping. It also found that Minor and Clark were each guilty of two counts of rape. It acquitted on all remaining counts.

{¶ 21} On September 10, 2015, the trial court held a sentencing hearing. The trial court, after a lengthy explanation of the factors and purposes of sentencing, sentenced Reed to a total of 15 years in prison. Specifically, the trial court determined that the felonious assault counts should merge and sentenced Reed to 5 years on the merged count, as well as 5 years on each of the 2 kidnapping counts, each to be served consecutively to the others.

{¶ 22} Reed now appeals.

II. ASSIGNMENTS OF ERROR

{¶ 23} Reed raises two assignments of error for review:

[I.] THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF FELONIOUS ASSAULT AND KIDNAPPING AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[II.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.

*State v. Reed*, 10th Dist. No. 15AP-952, 2016 WL 4441528, at *1–5 (Ohio Ct. App. Aug. 23, 2016).  On August 23, 2016, the appellate court overruled Petitioner's first assignment of error, but sustained the second assignment of error, remanding the case to the trial court to make appropriate findings required under Ohio law for imposition of consecutive terms of incarceration.  *Id.*  On February 22, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal.  *State v. Reed*, No. 2016-1458, 2016-Ohio-5494, 148 Ohio St.3d 1412 (Ohio 2017).   On September 15, 2016, the trial court issued an amended judgment entry of sentence pursuant to the remand of the Ohio Court of Appeals.  (Doc. 16, PAGEID #:  140).

On February 22, 2018, Petitioner filed this habeas corpus Petition.  He asserts that his convictions are against the manifest weight of the evidence, and that the evidence is constitutionally insufficient to sustain his convictions.  Respondent opposes the Petition.

## II.     STANDARD OF REVIEW

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this case.  The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy."  *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011) ); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a
federal court from granting relief with respect to a "claim that was adjudicated on the merits in
State court proceedings" unless the state court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Further, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a
> person in custody pursuant to the judgment of a State court, a determination of a
> factual issue made by a State court shall be presumed to be correct. The applicant
> shall have the burden of rebutting the presumption of correctness by clear and
> convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision
was contrary to, or involved an unreasonable application of, clearly established federal law as
determined by the Supreme Court, or based on an unreasonable determination of the facts in light
of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)
(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006) ). The United States Court of Appeals
for the Sixth Circuit has summarized these high standards:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state
> court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
> question of law[,]" or (2) "the state court confronts facts that are materially
> indistinguishable from a relevant Supreme Court precedent and arrives" at a
> different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146
> L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application"
> under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from
> [the Supreme] Court's cases but unreasonably applies it to the facts of the
> particular ... case" or either unreasonably extends or unreasonably refuses to
> extend a legal principle from Supreme Court precedent to a new context. *Id.* at
> 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id*. at 748–49. Ultimately, the burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.  DISCUSSION

#### A.  Manifest Weight

Petitioner asserts that his convictions are against the manifest weight of the evidence. This claim, however, does not provide a basis for federal habeas corpus relief. *See Hawkins v. Ross Corr. Inst.,* No. 2:17-cv-466, 2017 WL 3084586, at *2 (S.D. Ohio June 2, 2017) (citing *Williams v. Jenkins,* No. 1:15cv00567, 2016 WL 2583803, at *7 (N.D. Ohio Feb. 22, 2016) (citing *Nash v. Eberlin*, 258 F. App'x 761, 765, n.4 (6th Cir. 2007) ); *Norton v. Sloan*, No. 1:16-cv-854, 2016 WL 525561, at *5 (N.D. Ohio Feb. 9, 2017) (citing *Ross v. Pineda*, No. 3:10-cv-391, 2011 WL 1337102, at *3 (S.D. Ohio) ) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law."); *Taylor v. Warden, Lebanon Corr. Inst*., No. 2:16-cv-237, 2017 WL 1163858, at *10–11 (S.D. Ohio March 29, 2017) ).

Under Ohio law, a claim that a verdict was against the manifest weight of the evidence— as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, this Court cannot consider Petitioner's claim that his convictions were against the manifest weight of the evidence.

**B. Sufficiency of the Evidence**

Petitioner also asserts that the evidence is constitutionally insufficient to sustain his convictions. The state appellate court rejected this claim on the merits:

{¶ 24} In his first assignment of error, Reed argues that his convictions were not supported by sufficient evidence. . . .

{¶ 25} Sufficiency is:

"[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; Black's Law Dictionary 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Monroe*, 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

\*\*\*

1. Felonious Assault

{¶ 28} In Ohio, the offense of felonious assault includes the following prohibition:

No person shall knowingly do * * * the following:

(1) Cause serious physical harm to another * * *.

R.C. 2903.11(A)(1). "Serious physical harm" is separately defined in relevant part as:

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

* * *

> (e) Any physical harm that involves acute pain of such duration as
> to result in substantial suffering or that involves any degree of
> prolonged or intractable pain.

R.C. 2901.01(A)(5)(b), (c), and (e). Moreover, although no evidence was
introduced at trial that Reed ever physically touched A .B. or B.P., a person who
is complicit in an offense "shall be prosecuted and punished as if he were a
principal offender," and a person is complicit in the sense potentially relevant
here when, "acting with the kind of culpability required for the commission of an
offense" the person "[a]id[s] or abet[s] another in committing the offense." R.C.
2923.03(A)(2) and (F).

{¶ 29} A.B. testified that Minor and Clark stomped B.P. with their feet and hit
him with their hands. The physician from Mount Carmel West Hospital who
treated B.P. testified that B.P. presented with, among other injuries, a broken rib,
a collapsed left lung, and a ruptured spleen rating 4 of 5 on the severity scale. The
physician testified that due to his condition, B.P. was admitted to the intensive
care unit where he remained throughout his 5–day hospitalization. This testimony,
when considered in the "'light most favorable to the prosecution'" was sufficient
to support the conclusion that some persons feloniously assaulted B.P. but not that
Reed did. *Monroe* at ¶ 47, quoting *Jenks* at paragraph two of the syllabus.

{¶ 30} The question then, is whether the evidence was sufficient to conclude that
Reed was complicitous to the felonious assault. It is settled law that "'the mere
presence of an accused at the scene of a crime is not sufficient to prove, in and of
itself, that the accused was an aider and abettor.'" *State v. Johnson*, 93 Ohio St.3d
240, 243 (2001), quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982).
However, "'participation in criminal intent may be inferred from presence,
companionship and conduct before and after the offense is committed.'" *Johnson*
at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971). Thus, the
appropriate consideration is whether there were facts sufficient to show that Reed
shared the criminal intent of those persons who assaulted B.P.

{¶ 31} A.B. testified that Reed was not involved in the assault of B.P. Although
she equivocated on the issue, she said Reed checked on her and B.P. while they
were in the basement. In addition, though her testimony varied on this point also,
A.B. testified that Reed may have been the person who called B.P. and her into
the house. Moreover, an expert in cell phone analysis with the Columbus Division
of Police testified that the Apple iPhone 4 recovered from the scene contained
Apple ID and Kik ID information indicating the accounts on that phone were
associated with "Charles Reed." (Tr. Vol. 3 at 568–70, 575–77.) According to the
expert, on June 24, 2014, at 5:18 p.m., a text was sent from the iPhone to a
recipient named "Destiny" which said, "I am on Harris." (Tr. Vol. 3 at 578.) Then
at 1:05 a.m. on June 25, the iPhone received a message that said, "[d]id that

situation resolve itself at Harris?" (Tr. Vol. 3 at 579.) The iPhone contained a video showing A.B. naked in front of a dog cage appearing to urinate on B.P. The expert explained that while he could not say that this particular phone took the video, he could discern that the video was taken by the same model of phone running the same edition of the operating system, that the video was taken on June 24, 2014 at 4:46 p.m., and that it was taken at the house on North Harris Avenue. Finally, the officer who arrested Reed testified that he attempted to flee the house on North Harris Avenue when the police arrived.

{¶ 32} "'[V]iewing the evidence in a light most favorable to the prosecution,'" we find that a "'rational trier of fact could have found'" that Reed participated in the criminal intent of those persons who perpetrated the felonious assault. Monroe at ¶ 47, quoting *Jenks* at paragraph two of the syllabus. Though the expert could not definitively say that the iPhone 4 in question belonged to Reed or that it had been used to take the video of A.B. and B.P., a reasonable jury could have inferred both those facts from the expert's testimony. We find the evidence was sufficient for the jury to find that Reed was a complicitor in causing serious physical harm to B.P., being present in the basement during the assaults, and apparently involved enough to record a video of the crime scene during the time of the events in question. In addition, although A.B. equivocated on this point, A.B.'s testimony was sufficient for the jury to conclude that Reed was instrumental in inviting A.B. and B.P. back to the house where the assaults occurred and, thereafter, participated in keeping them in the house during the time period of the assaults. Finally, Reed's flight from the house (though also potentially understandable as a desire to not be arrested at a drug house) could be consciousness of guilt about the treatment of A.B. and B.P. Taken as a whole, the evidence was sufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that Reed was complicit in the felonious assault of B.P.

{¶ 33} When considering manifest weight of the evidence, there was no suggestion by the evidence that B.P.'s injuries were feigned or that the physician who testified was not credible or incorrect in his testimony. When considering whether the evidence introduced at trial was weighty enough to support the conviction, the issue resolves to a question of whether A.B. was credible in reporting how B.P. sustained the injuries, at whose hands, and the extent of Reed's participation and complicity in the assault on B.P.

{¶ 34} A.B.'s testimony that B.P. was stomped was convincingly corroborated by the fact that B.P. had a collapsed lung, broken rib, and ruptured spleen when he arrived at the hospital. Moreover, Reed's involvement in A.B.'s and B.P.'s presence at the house at 125 North Harris Avenue during the evening was corroborated by the cell phone video recovered from Reed's phone depicting A.B. and B.P. in a state of naked misery at 125 North Harris Avenue on June 24, 2014 at 4:46 p.m.

{¶ 35} A.B. was, at the time of the incident, a heroin addict who was experiencing symptoms of withdrawal. Her testimony was inconsistent throughout trial about who did what and how many assailants there were. Rather than make allegations about any specific defendant, she repeatedly used vague pronouns such as "they" or "them." (Tr. Vol. 2 at 128–30.) She also, at one point, appeared to testify that many of the people who harmed her were not defendants at trial. A.B. admitted to being a thief and "boosting" (stealing barter items to obtain heroin) repeatedly for ten years. (Tr. Vol. 2 at 208.) She admitted to having lied to the police when she spoke to them at the hospital. She also admitted she did not remember what she said at the hospital or whether she had initially claimed to have been raped by four or five men. Reed was excluded as a contributor to all the useable DNA samples collected from bodies of B.P. and A.B. as well as the various implements allegedly used on B.P. Finally, A.B. equivocated about the extent of Reed's participation in the entire evening:

Q. Do you know who came down to check on you?

A. There was several different people.

Q. Okay. Who?

A. [Minor] had [Clark], [an acquitted co-defendant], and [Reed].

Q. They all what?

A. They all checked on us at one point.

* * *

Q. And what involvement did [Reed] have that night?

A. Not a whole lot. He checked on us in the basement, nothing else, really.

Q. Did he ever make sure that you didn't leave?

A. I am not sure.

* * *

Q. What was [Reed's] involvement?

A. Not a whole lot of anything. Calling us back to the house, really.

Q. Did he come in and out of the basement?

A. I am not real sure.

Q. Did you see him throughout the night?

A. No.

* * *

Q. I think when you first testified, you said you think that [Reed] may have been the person who called you back in?

A. Yes.

Q. Do you recall that there were other people outside at the same time when [Reed] was out there?

A. There might have been a couple people. I remember him saying, hey, you know, asking [B.P.] to come back.

Q. Do you remember being interviewed by the police? I guess maybe you don't recall being interviewed by the police?

A. I don't recall a lot of it, no.

Q. If you told the police that [Reed] was out there along with [Clark] and several other people, and that you weren't sure who was calling you back?

A. No, I don't remember hearing that.

Q. Would you have any reason to lie about that?

A. No.

(Tr. Vol. 2 at 134–35, 151, 154–55, 202.)

{¶ 36} After review of the record, we cannot say, based on the evidence in this case, that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. We conclude that the conviction for felonious assault as a complicitor is not against the manifest weight of the evidence.

2. Kidnapping

{¶ 37} The Ohio Revised Code defines the offense of kidnapping in relevant part as follows:

(A) No person, by force [or] threat, * * * shall * * * restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another;

* * *

(B) No person, by force [or] threat, * * * shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim * * *:

* * *

(2) Restrain another of the other person's liberty.

R.C. 2905.01(A)(2), (3), (B)(2). A person who is complicit in an offense "shall be prosecuted and punished as if he were a principal offender," and a person may be found to be complicit when, "acting with the kind of culpability required for the commission of an offense," the person "[a]id[s] or abet[s] another in committing the offense." R.C. 2923.03(A)(2) and (F).

{¶ 38} A.B. testified that after she and B.P. were forced at gunpoint to strip naked and sent into the basement, that they were not permitted to leave for six hours. Although A.B. testified that she did not check to see if the basement door was locked, a number of persons, including Reed, came down to the basement from time to time to make sure they were still there. In addition, B.P. was caused serious physical harm while he was being held in the basement. This evidence was sufficient to sustain the convictions for kidnapping as set forth above.

{¶ 39} Despite the general vagueness of A.B.'s testimony in general and the other issues affecting her credibility, the video shot of A.B. and B.P. in the basement of 125 North Harris Avenue is strong corroborating evidence that A.B. and B.P. were being forcibly kept for some period of time in the basement of that premises. Under the circumstances and after review of the record, we cannot say that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. We thus determine that the convictions for kidnapping are not against the manifest weight of the evidence.

{¶ 40} Reed's first assignment of error is overruled.

*State v. Reed*, 2016 WL 4441528, at *5–10.

In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West,* 505 U.S. 277, 296 (1992) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id*. (quoting *Jackson,* 443 U.S. at 326). Instead, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. at 296–97 (quoting *Jackson,* 443 U.S. at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, deference first must be given to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 567 F.3d 191, 205 (6th Cir. 2009). Second—and even if a de novo review of the evidence leads to the conclusion that no rational trier of fact could have so found— a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id*.; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle for a habeas petitioner to overcome.

Here, Petitioner argues that A.B. never unequivocally indicated that she was being held against her will or that he was the person who called her and B.P. back into the house. He further argues that the prosecution did not prove that it was his iPhone or that he recorded the video found by police, and that his flight did not indicate evidence of guilt, as he did not want to

be arrested at a drug house. At base, Petitioner asserts that the prosecution established no more than his presence at the scene of the crimes and that alone, Petitioner argues, is constitutionally insufficient to sustain his convictions as an aidor and abettor under Ohio law.

At trial, A.B. testified that she had dated B.P. for thirteen years. *Transcript* (Doc. 16-2, PAGEID #: 309). The two frequented the home of Ivan Minor, or "Ivo," on Harris Avenue weekly to purchase heroin. (PAGEID #: 310–11). On the evening of June 24, 2014, they went to Ivo's house on Harris where they had been earlier that same day, as B.P. was going to do some tattoos. (PAGEID #: 312–13). A.B. testified that, as they were leaving, someone called them back into the house.

Q. By whom, if you know?

A. I don't know.

(PAGEID #: 313).

I believe a man called us.

\*\*\*

He. . . hollered for Brian, and I heard him, and I told Brian they are hollering for you, you know, go see what they want. So we turned around and came back.

(PAGEID #: 313–14). A.B. was told to go into the kitchen, empty her pockets, and get undressed; B.P. entered the house through a different door. (PAGEID #: 314). She thought that someone was holding a gun, but could not remember for sure. (*Id.*) It was A.B.'s understanding that some heroin had come up missing, and they thought she and B.P. had taken it. (PAGEID #: 315). Ivo and others—she was not sure who or how many of them—conducted cavity searches on them in the kitchen and basement. (PAGEID #: 318–19). They beat Brian with a bottle, a BB gun, a leather strap, and a butcher knife; and stuck him in a dog cage. (PAGEID #: 319). Ivo and Davonte stomped him with their feet and hit him with their hands. (PAGEID #: 320).

They shot him with the BB gun and raped him with a broom. (PAGEID #: 321). When he passed out they dumped cold water on him and would start hitting him again. (PAGEID #: 322). They burned his skin with the tip of a heated butcher knife. (PAGEID #: 324–25). She got kicked in the head a couple of times, but could not identify her assailant. (PAGEID #: 322). These events transpired over the course of at least six hours in the basement of the house. A.B. testified that she could not leave:

> Q. How did they make sure that you didn't leave?
>
> A. Um, they had people come downstairs to make sure we were down there. I am not sure if they locked the basement door or not. I didn't never check, so I don't know.
>
> Q. Why didn't you ever check?
>
> A. I was scared to.
>
> Q. Do you know who came down to check on you?
>
> A. There was several different people.
>
> Q. Okay. Who?
>
> A. Ivo had Davonte, Terril, and Man.
>
> ***
>
> They all checked on us at one point.

(PAGEID #: 326–27). A.B. testified that she refers to Petitioner Charles Reed as "Man." (PAGEID #: 343). She told the jury that she was not sure who was in charge, "[t]hey seemed like they all did the same thing." (PAGEID #: 327). According to her testimony, Ivo and Davonte beat B.P., as did other persons but she could not identify them. (PAGEID #: 327). Likewise, she knew someone used an iPhone to record her on top of B.P's cage but she could not say who. (*Id.*) Eventually, they were told that they could leave. She got B.P's clothes and

helped him dress. They were warned not to call the police, or they would get hurt. (PAGEID #: 328). They gave her and B.P drugs to help him with the pain during the time that they were in the basement. (PAGEID #: 329). She testified that she left three cell phones and $30.00 at the house. (PAGEID #: 330). They then went to a friend's house and ultimately took B.P to the hospital. (PAGEID #: 331). She could not say how many people came in and out of the basement during the time that they were there. (PAGEID #: 333). A.B. testified that Petitioner did not physically assault anyone and was not involved in the cavity searches. (PAGEID #: 395–96).

Petitioner was convicted as an aider and abettor. Ohio Revised Code § 2923.03(A)(2) provides that "No person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense[.]"

> A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2015-Ohio-517, 2015 WL 628352, ¶ 34, citing *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001). Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist. 1981), citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist. 1971); see also *State v. Harmon*, 8th Dist. Cuyahoga No. 53221, 1988 WL 18636 (Feb. 18, 1988).

*State v. Carradine*, 38 N.E.3d 936, 942 (Ohio Ct. App. Sept. 10, 2015). The trial court instructed the jury that the Petitioner could be convicted as an aider and abettor to any or all counts and specifications charged. *Transcript* (Doc. 16-5, PAGEID #: 1031–33). As the state appellate court explained, "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor" under Ohio law. *State v. Johnson*, 93 Ohio St.3d 240, 243 (Ohio 2001) (citing *State v. Widner*, 69 Ohio St.2d 267, 269

(Ohio 1982)). The Ohio Supreme Court has stated that "[t]his rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.* However, "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Johnson*, at 245 (quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (1971)).

The state appellate court construed the following evidence of Petitioner's guilt as an aider and abettor in favor of the prosecution: flight at the time of arrest; the video found on the iPhone associated with his name; and A.B.'s testimony that she believed Petitioner called B.P. and her back into the house as they were leaving, that Petitioner was present at least periodically during the events at issue, and that Petitioner came down into the basement, at least at one point in time in order to make sure that they did not leave. Based on this, the state appellate court determined that these facts were sufficient to establish Petitioner's guilt as an aider and abettor on the charges of felonious assault and kidnapping on the night in question.

This Court reviews that decision under an extremely doubly deferential lens of both *Jackson v. Virginia* and AEDPA. Notably, Petitioner "faces a nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (citation omitted). "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). Further, and "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Additionally, "a federal habeas court may overturn a state court's rejection of an insufficient-evidence claim only if the state court's decision was

objectively unreasonable under § 2254(d)." *Danielak v. Brewer*, -- F. App'x --, 2018 WL 4049076, at *1 (6th Cir. Aug. 24, 2018) (citing *Coleman v. Johnson,* 566 U.S. 650, 651 (2012)).

The precise definition of "objectively unreasonable" remains elusive. *Maynard v. Boone*, 468 F.3d 665, 670–71 (10th Cir.2006) (discussing the failure of most federal courts to further define the phrase "objectively unreasonable" and collecting cases). Several of our sister circuits, however, have attempted to clarify the term. The First Circuit has explained that "if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application," and that "'some increment of incorrectness beyond error is required.'" *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (en banc) (quoting with approval *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000)).

Taking a somewhat different tack, the Seventh Circuit has explained that a state court's decision is sustainable under AEDPA if it "is at least minimally consistent with the facts and circumstances of the case," *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.1997), or even "if it is one of several equally plausible outcomes," *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir.1997), and that a decision is objectively unreasonable only where it is "well outside the boundaries of permissible differences of opinion," *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir.2002); *see also Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir.2000) (explaining that a state court's decision is not unreasonable if it took the controlling standard "seriously and produce[d] an answer within the range of defensible positions"). The Tenth Circuit has similarly opined that "[i]t is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision," but instead "the state court decision must be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable." *Maynard,* 468 F.3d at 671 (internal quotation marks omitted).

This court has not delved deeply into the issue, but one judge has indicated that where a state court makes "a close call" on a constitutional question, this "militates against the conclusion that the state court's application of the relevant Supreme Court precedent was objectively unreasonable." *Lopez v. Wilson*, 426 F.3d 339, 358 n. 1 (6th Cir.2005) (en banc) (Cole, J., concurring) (internal quotation marks omitted). Moreover, the Supreme Court has recently explained that "[w]hen assessing whether a state court's application of federal law is unreasonable, 'the range of reasonable judgment can depend in part on the nature of the relevant rule' that the state court must apply." *Renico v. Lett*, ⸺ U.S. ⸺, 130 S.Ct. 1855, 1864, 176 L.Ed.2d 678 (2010) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).

*Davis v. Lafler*, 658 F.3d at 534-35.

In this case, the video on the iPhone provided circumstantial evidence of Petitioner's involvement in the crime. In addition, Petitioner's flight from police may be viewed as circumstantial evidence of guilt, despite his alternative explanation for it. *See Diggs v. Warden, Noble Corr. Inst.,* No. 2:15-cv-02117, 2016 WL 1594592, at *10 (S.D. Ohio April 21, 2016) (citing *See United States v. White*, 543 F. App'x 563, 567 (6th Cir. 2013)). Finally, A.B.'s testimony provided support for the conclusion that Petitioner was more than an innocent bystander. To be sure, parts of her testimony equivocated on the extent of Petitioner's involvement, but the jury—not this Court—was responsible for resolving those inconsistencies.

Given all of this, it was not unreasonable for the state appellate court to determine that the facts were sufficient to establish Petitioner's guilt as an aider and abettor on the charges of felonious assault and kidnapping. And, consequently, Petitioner has not met his high burden here.

## IV.    RECOMMENDED DISPOSITION

Therefore, the Undersigned **RECOMMENDS** that the Petition be **DENIED** and that this action be **DISMISSED**.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.

Date: December 31, 2018                     /s/ Kimberly A. Jolson
                                            KIMBERLY A. JOLSON
                                            UNITED STATES MAGISTRATE JUDGE